J-S04031-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: | : | IN THE SUPERIOR COURT OF |
| Y.A.I.A.H.R.M., A MINOR | : | PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: C.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2811 EDA 2016 |

Appeal from the Decree July 22, 2016
in the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000394-2016,
FID: 51-FN-339181-2009

BEFORE: SHOGAN, OTT, JJ., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.: **FILED FEBRUARY 14, 2017**

Appellant, C.M. ("Mother"), files this appeal from the decree entered July 22, 2016, in the Philadelphia County Court of Common Pleas by the Honorable Joseph Fernandes, granting the petition of the Department of Human Services ("DHS") and involuntarily terminating Mother's parental rights to her minor, dependent son, Y.A.I.A.H.R.M. ("Child"), born in January of 2011, pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1] After review, we affirm the trial court's decree.

---

* Former Justice specially assigned to the Superior Court.

[1] By separate decrees, dated August 24, 2016 and entered on August 26, 2016, the trial court involuntarily terminated the parental rights of Child's father, M.W. ("Father"), as well as those of any unknown father. An appeal has not been filed by Father or an unknown father, nor are they parties to the instant appeal.

The trial court summarized the relevant procedural and factual history, in part, as follows:

The family in this case has been known to DHS for some time. In 2009, the court involuntarily terminated Mother's parental rights to two of her children. On January 14, 2011, DHS received a General Protective Services ("GPS") report that Mother had tested positive for drugs when she gave birth to Child. DHS visited Mother in the hospital, and Mother admitted that she used drugs. DHS obtained an Order of Protective Custody ("OPC") and placed Child in a foster home. Child was adjudicated dependent on February 22, 2011, and fully committed to DHS custody. On April 16, 2012, the trial court reunified Child with Mother under DHS supervision. DHS supervision was then discharged on December 5, 2012.

On August 26, 2014, DHS received a GPS report that Child had untreated medical needs, was being abused by Mother, and that Mother used drugs. DHS visited Mother, who refused to allow DHS into her house. She was verbally abusive and refused to let DHS speak to Child. She told DHS she intended to drop Child off at DHS for placement. Later that day, Mother appeared at DHS, and informed DHS that Child was with B.M. ("Grandmother"), his maternal grandmother, and that Mother no longer wanted Child to be placed. DHS contacted Grandmother, who said she did not have Child and did not know where he was. The trial court adjudicated Child dependent on February 23, 2015, ordered DHS to supervise and ordered Mother to take random drug screens. Mother repeatedly tested positive for drugs. The case was then transferred to a Community Umbrella Agency ("CUA"). On May 18, 2015, DHS received a GPS report that Child's whereabouts were unknown. At a May 26, 2015 permanency hearing, the court heard that Mother was incarcerated for probation violations, and Child's whereabouts were still unknown. The court ordered DHS to hire a private investigator to locate Child. Mother refused to divulge Child's location at a July 13, 2015, permanency review. Mother again refused at an August 18, 2015, permanency review, and the court held her in contempt. As a result, Mother was jailed until the next hearing. On October 13, 2015, Mother admitted that Child was with Grandmother. DHS obtained an OPC and placed Child in a foster home. On October 15, 2015, the court fully committed Child to DHS custody, and found aggravated circumstances as to Mother,

ordering that DHS need not make reasonable efforts to reunify Child and Mother.

Trial Court Opinion ("T.C.O."), 9/21/16, at 1-2 (citations to record omitted).

DHS filed a petition to terminate Mother's parental rights on April 28, 2016. The trial court held termination/goal change hearings on May 23, 2016, June 23, 2016, and July 22, 2016. DHS presented the testimony of M.W. ("Foster Mother"), M.W. ("Foster Father"), CUA visitation coach Daphane Ramos, CUA case manager Christoria Releford, psychologist Dr. William Russell, and trauma therapist Marquita Bolden. Mother testified on her own behalf. On July 22, 2016, the trial court involuntarily terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[2] On August 23, 2016, the trial court granted Mother's request to appeal *nunc pro tunc* and, on August 26, 2016, Mother, through counsel, filed a notice of appeal, along with a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).[3]

_____

[2] The trial court entered a separate order changing Child's permanency goal to adoption. As Mother does not appeal this order, any claim related thereto is not preserved. **See** Pa.R.A.P. 903(a) (a notice of appeal shall be filed within thirty days after the entry of the order from which the appeal is taken). Moreover, any such claim is waived as Mother failed to address this issue in her brief. **See In re W.H.**, 25 A.3d 330, 339 n.3 (Pa.Super. 2011) (stating, "where an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived.")

[3] Mother submitted a second statement of errors complained of on appeal, differing from the statement filed with her notice of appeal. As the Rules of Appellate Procedure do not provide for the filing of an amended concise statement with the brief, we do not consider this second statement.

On appeal, Mother raises the following issues for our review:

1. Did the Department of Human Services (DHS) sustain the burden that Mother's rights should be terminated when there was evidence that Mother had completed and/or had been actively completing her permanency goals?

2. Was there sufficient evidence presented to establish that it was in the best interest of the child to terminate Mother's parental rights?

Mother's Brief at 4.[4]

In matters involving involuntary termination of parental rights, our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 616 Pa. 309, 47 A.3d 817, 826 (2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties

_____

[4] We observe that Mother stated her issues on appeal in her brief somewhat differently from her Rule 1925(b) Statement. We nevertheless find Mother preserved challenges to the termination of her parental rights under Sections 2511(a)(1), (2), and (b). To the extent Mother addresses subsections (a)(5) and (8) in her brief, Mother waived any contest under these subsections as she failed to discuss them in her Rule 1925(b) Statement. *See Krebs v. United Refining Co.*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to raise issues in both the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues).

spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M., T.R.M., T.J.M., T.A.M., & N.D.M.*, 71 A.3d 251, 267 (Pa. 2013). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.,* 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, controls the termination of parental rights, and requires a bifurcated analysis, as follows.

> Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct,

weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." ***In re C.S.***, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*).

In the case *sub judice*, the trial court terminated Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), and (8), as well as (b). We have long held that, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), well as Section 2511(b). ***See In re B.L.W.***, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc)*. Here, we analyze the court's termination order pursuant to subsections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> ***
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions

- 6 -

described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

We first examine the court's termination of Mother's parental rights under Section 2511(a)(2).

In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003) (citation omitted). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct, [but may also] may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

Mother argues that DHS failed to establish grounds for the termination of her parental rights as she was "close to achieving all her goals," noting that she had completed parenting classes, participated in mental health and drug and alcohol treatment, visited Child, and maintained employment. Mother's Brief at 11. However, the trial court set forth ample grounds for the termination of Mother's rights under Section 2511(a)(2):

Mother has demonstrated a pattern of noncompliance with her SCP [Single Case Plan] objectives. She was ordered to attend drug and alcohol treatment, but never signed releases or

- 7 -

provided documents to that effect. Child has been in care since October 15, 2015, and the only evidence that Mother is engaging in drug and alcohol treatment that she has ever provided CUA or the court is her testimony, which the trial court found not credible.

Mother admitted to past drug use, and tested positive a number of times during the life of this case. Mother claims these positives are caused by her prescription Xanax, but Mother never provided the prescription, despite court orders. Dr. Russell testified that Mother's inconsistency in taking her medication rendered it ineffective.

Mother has a long history of mental illness. Mother's current mental health problems make her unable to provide safety and permanency for Child. Mother is engaged in therapy, but that therapy is ineffective and may not even be addressing all of Mother's diagnoses. Mother has demonstrated the negative effects of her improperly-treated mental illness at visits and at court.

Mother attends visits [with Child] consistently, but the visits are not productive or positive. During visits Mother has screamed at Child for calling Foster Father "Dad[.]" She has called Child ugly and encouraged him to steal. Mother has chastised Child for reporting physical and sexual abuse. Mother has refused to interact with Child during some visits, and has demanded [that] he return gifts given during other visits. Child is in trauma therapy for PTSD.

Mother has attempted to interfere with Child's therapy. She has refused to sign medical consents, and ruined consent forms presented to her. She attempted to get the trauma therapist to change Child's treatment from age-appropriate play therapy to lecture-based instruction. Mother refused to participate in the therapy because it was too far away for her. Mother's visitation with Child was reduced and then suspended as a result of the progress of Child's trauma therapy.

Mother has had ample time to allow CUA to evaluate her house to see if it was appropriate for reunification. Instead she engaged in a fraudulent scheme to obtain government assistance. On the last day of the termination trial, she testified she was finally willing to allow CUA inside her house. Mother

> was referred to ARC for services, but was unsuccessfully discharged.
>
> Mother has failed to make affirmative steps to complete her objectives and place herself in a position to parent Child. In fact, Mother's actions have made her *less* able to parent Child. Mother hid Child from CUA, was held in contempt of court and went to prison when she failed to disclose his location. Mother interfered with Child's trauma therapy and berated him during visits. Mother's conduct and failure to comply with court orders –[]even in the face of jail time – shows that Mother would be unable to remedy the causes of her incapacity in order to provide Child with essential parental care, control or subsistence necessary for his physical and mental well-being. Child needs permanency, which Mother cannot provide. Termination under this section was … proper.

T.C.O. at 9-10 (citations to record omitted) (spaces added).

A review of the record supports the trial court's determination of a basis for termination under Section 2511(a)(2). Mother has not recognized her role in causing Child to be adjudicated dependent and kept under the continued supervision of DHS. Mother blatantly disregarded the trial court's order that Child be taken into custody as she concealed Child's location for months. Notes of Testimony ("N.T."), 5/23/16, at 56. CUA case manager, Christoria Releford, testified that Mother does not understand why Child is currently in foster care. Ms. Releford would constantly redirect Mother and indicate that Child was placed as Mother concealed his location. Mother accuses DHS of taking Child into custody unfairly when Mother was being evicted and attempting to receive rental assistance. However, in reality, Mother was not being evicted and was not behind in her rent. N.T., 5/23/16, at 60-61; N.T., 7/22/16, at 33-38.

Further, we agree that Mother's compliance with her SCP objectives was "minim[al]." N.T., 5/23/16, at 65; N.T., 7/22/16, at 17. Mother's objectives were to participate in drug and alcohol treatment, obtain a dual diagnosis evaluation and follow-up treatment, comply with the terms of her probation, maintain employment with participation in the Achieving Reunification Center, maintain visitation, obtain a parenting capacity evaluation, and comply with court orders as they relate to refraining from threatening those involved in the case. N.T., 5/23/16, at 65.

Mother's attempt to attend drug and alcohol treatment was inconsistent, undocumented, and ineffective. Mother was referred to the Achieving Reunification Center ("ARC") for services, including drug and alcohol treatment, but was discharged. N.T., 5/23/16, at 61-62; DHS Exhibit 10. Mother declined drug and alcohol services but did maintain enrollment in a program at Southwest Nu-Stop. N.T., 5/23/16, at 62; DHS Exhibit 10. However, Mother did not verify present proof of her drug, alcohol, mental health treatment and refused to sign releases to obtain information related to this treatment.[5] N.T., 5/23/16, at 58-59; N.T.,

_____

[5] Mother testified that she presented to the CEU on May 23, 2016, but was advised that they were in possession of all information. N.T., 7/22/16, at 15-16, 30-31. We note that the trial court found Mother's testimony not credible. *Id.* at 45. At the termination hearing, Mother did present letters from her supervising probation officer and FIR case manager, noting participation at Southwest Nu-Stop for the first time at the hearing. Mother's Exhibits M-1 and M-2.

7/22/16, at 10-12, 15-16. Moreover, Mother tested positive for benzodiazepines as recently as April 2016. N.T., 5/23/16, at 62-63; N.T., 7/22/16, at 11. Although Mother claimed these positive drug screens were the result of taking prescribed Xanax, Mother failed to provide any proof of this prescription. N.T., 5/23/16, at 63-64; N.T., 7/22/16, at 16-17.

Most significantly, Mother has a history of mental illness. N.T., 6/23/16, at 9-11; N.T., 7/22/16, at 31-32. Dr. Russell, who performed a parenting capacity evaluation of Mother, opined that Mother suffers from mood disorder and anxiety disorder. Dr. Russell noted that Mother had "difficulty staying on topic, . . . difficulty organizing thoughts, . . . [and] issues with poor judgment," which were present dating back to a prior evaluation in 2009. *Id.* at 18. Mother admitted ongoing impulse control and/or anger outbursts. *Id.* at 11, 14, 27. Dr. Russell observed that Mother's "presentation during the evaluation was one of agitation and it almost appeared as if she would have an outburst at any given time." *Id.* at 14. With regard to Mother's judgment and insight, Dr. Russell offered, "There are multiple instances where she basically had major problems with insight in understanding her role. She still presented herself as the victim rather than understanding that it was her behavior, her history that's impacting her children's presentation." *Id.* He opined that Mother could not provide for Child's safety or permanency. In fact, Dr. Russell indicated that Mother could not even provide for her own permanency:

Q.    Okay.  And as far as your assessment of [Mother] as an evaluator, did you form any opinion as to her ability to provide safety for [Child] who is the child before the court today?

A.    Given the long history of mental health issues, the long history with difficulty maintaining employment, the difficulty providing financial stability for herself, the long standing substance abuse issue with the recent relapse, it was my impression that she could not provide safety for [Child].

Q.    And did you form any opinion with regards to [Mother]'s ability to provide permanency for [Child]?

A.    She was not able to provide a picture where she could provide permanency for herself let alone a child.

*Id.* at 15-16.  He stated that his opinion would not be altered if Mother were enrolled in drug treatment since August 2015, enrolled in therapy and compliant with medication, compliant with probation, or employed for a four-month period.  *Id.* at 16-17, 25-26.  Dr. Russell recommended Mother seek the proper mental health treatment, as he questioned the success of Mother's current therapeutic relationship.  He additionally advised Mother to have a psychiatric evaluation.  *Id.* at 17.

Hence, the record substantiates the conclusion that Mother's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental control or subsistence necessary for their physical and mental well-being.  *See In re Adoption of M.E.P.*, 825 A.2d at 1272. Moreover, Mother cannot or will not remedy this situation.  As noted above, in order to affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a) before assessing the determination under Section 2511(b).  *In re B.L.W.*, 843 A.2d at 384.

We next determine whether termination was proper under Section 2511(b). Our Supreme Court has stated as follows:

> [I]f the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." *In re K.M.*, 53 A.3d 781, 791 (Pa.Super. 2012). In *In re E.M. [a/k/a E.W.C. & L.M. a/k/a L.C., Jr.]*, 620 A.2d [481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. *In re K.M.*, 53 A.3d at 791. However, as discussed below, evaluation of a child's bonds is not always an easy task.

*In re T.S.M.*, 71 A.3d at 267. "[I]n cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case." *In re Adoption of J.M.*, 991 A.2d 321, 324 (Pa. Super. 2010) (citations omitted).

When evaluating a parental bond, "the court is not required to use expert testimony. Social workers and caseworkers can offer evaluations as well. Additionally, Section 2511(b) does not require a formal bonding evaluation." *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2010) (internal citations omitted). Moreover,

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.

- 13 -

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. . . .

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011) (quotation marks and citations omitted) (citing *In re K.K.R.-S.*, 958 A.2d 529, 533 (Pa.Super. 2008))) (internal citations omitted).

In the case *sub judice*, in reasoning that termination of Mother's parental rights favors Child's needs and welfare under Section 2511(b) of the Adoption Act, the trial court stated:

> Mother visits Child consistently, but the visits are not productive. Mother is inappropriate with Child, screaming at him about inconsequential things like his haircut, as well as matters of great importance, like physical and sexual abuse. Mother encourages Child to hate himself. Child has bad behaviors before and after visits with Mother. He soils and urinates on himself when a visit is near. Child suffers from PTSD as a result of his treatment by Mother, but Mother minimizes the problems and instructs Child not to report. Mother refused to participate in trauma therapy, and even interfered with Child's therapy, placing her desires and convenience above the medical and emotional needs of Child. Mother prevented Child from interacting with his sibling during a visit in order to prevent "issues." This is the very definition of *pro forma* visitation, where Mother was complying with the order to visit but not accomplishing the underlying goal of building and sustaining a parental bond. Child is not sad when visits are over, and does not ask about Mother. The court heard credible testimony that the bond between Mother and Child is gone. After Mother blew up and screamed at Child, Child began to routinely call his foster parents "Mom" and "Dad". Mother's visits were suspended at the request of the trauma therapist. Child is placed with Foster Mother and Foster Father, who intend to adopt him. Child sees Foster Mother and Foster Father as his parents, and it would be in Child's best interest to terminate Mother's parental rights,

since Child would not suffer irreparable harm. Consequently, the court did not abuse its discretion when it found that it was clearly and convincingly established that there was no positive parental bond, and that termination of Mother's parental rights would not destroy an existing beneficial relationship.

T.C.O. at 11-12 (citations to record omitted).

Mother, however, argues "there was insufficient evidence to establish that it was in the best interest of the child to be adopted." Mother's Brief at 13. Specifically, Mother avers that the trial court did not determine that a bond did not exist between her and Child and raises the failure of DHS to present certain evidence. *Id.* Moreover, Mother highlights that Child's trauma therapist noted a relationship between her and Child and that Child's anxiety prior to visits had decreased. *Id.*

In the case *sub judice*, the record likewise corroborates the trial court's termination order pursuant to Section 2511(b). Evidence was presented that Child has PTSD as a result of physical, sexual, and emotional abuse suffered in Mother's care. N.T., 6/23/16, at 39-40. Child exhibited symptoms such as defiance, mood dysregulation, lack of sleep, and anxious behaviors. *Id.* at 37-38, 40. As noted by Child's trauma therapist, Marquita Bolden, regarding Foster Parents' report of Child's symptoms:

They reported a pretty long list of symptoms even … following the intake. They reported that [Child] had defecated on the floor, that he had a lot of anxious behaviors such as picking at the stitching of his clothing, picking at his bed, the bedpost. They reported that he would have tantrums. That he was having a lot of difficulty sleeping and would at times go several days without sleeping. That he was very defiant. That he would play with his spit and smear it on the walls and that he was

extremely dysregulated, his mood. That he would have lots of
ups and downs.

*Id.* at 37-38. Mother did not participate in Child's therapy and would not
sign a release for medication for Child. N.T., 6/23/16, at 36-37; N.T.,
7/22/16, at 5-6. Further, Mother opposed play therapy, recommended
based upon Child's young age, and instead thought Child should "just sit"
and receive "direction." N.T., 6/23/16, at 36.

While Mother had supervised visitation with Child, there were issues
noted with visitation. At visitation, Mother yelled and/or screamed at Child
for calling Foster Father "Dad," as well as for the discovery and confirmation
of alleged physical abuse. N.T., 5/23/16, at 14-18, 22, 48-49. On other
occasions, Mother would not interact with Child and instructed Child's sibling
similarly because "she . . . didn't want any issues to happen" or "didn't want
[Child] to go back and say things that didn't happen during the visit." *Id.* at
36-37, 40. Further, Child threw tantrums during visits. *Id.* at 37, 41-42.
In addition, as suggested above, Child exhibited anxiety and insomnia
surrounding visits with Mother, and would urinate or defecate on himself, on
the floor, or in his bed. *Id.* at 19, 29-31. Child had additionally begun to
smear saliva "all over the place." *Id.* at 21.

As a result, Mother's visitation with Child was decreased from two
times per month to one time per month and then eventually ceased by Ms.
Bolden. N.T., 5/23/16, at 13; N.T., 6/23/16, at 38. Ms. Bolden testified as
to her reasoning for the suspension of visitation as follows:

My recommendation was that visits be suspended and contact be discontinued until there is significant intervention on the part of [Mother]. During the 6/16 phone call [Mother] acknowledged that she has been diagnosed with several mental health illnesses.

Reports that I received were that she had significant outburst[s] that were extremely triggered with [Child] during the visits. So from our standpoint there was a risk of harm in that, if [Child] is continued to be exposed to her outburst of anger and exposed to her statements minimizing his trauma history that this is going to further increase his symptoms.

N.T., 6/23/16, at 38. On cross-examination, Ms. Bolden reiterated the basis for the suspension of visitation, stating:

Based on my previous statements that mom stated that she has had significant mental health problems, that I'm hearing reports from the foster parents that [Child]'s symptoms increase around visits, that this child has been through significant trauma and mother['s] role has been reported to me as part of that trauma history and that the child could be extremely dysregulated in regard to what I've heard that occurs during visits.

*Id.* at 43.

CUA visitation coach, Daphane Ramos, who observed five visits between Mother and Child, testified to her opinion that there was no longer a bond between Mother and Child. N.T., 5/23/16, at 36, 42-43.

When the visits first started back in October, they had a really good bond. [Child] used to be super-excited to come into the visits. He used to come in -- Mom used to pretty much hold him the entire time. . . .

Compared to now, since March, the next (unintelligible) because, like, that's when they started observing visits, again, the bond is kind of gone -- for me is gone. The bond they used to have back in October, it's not the same as it is now.

*Id.* at 42-43. In fact, Foster Mother reported that since an outburst by Mother at a visit in January 2016, Child is not upset to leave visits with Mother does not even want to see Mother. *Id.* at 23, 24. Similarly, Ms. Ramos recounted that, at the last visit she observed between Mother and Child, Child "wanted to go back home with Mom and Dad," referring to Foster Parents. *Id.* at 43-44.

In addition, as reported by Foster Mother, Child also referred to himself as "stupid and ugly" and a "thief and a liar" and had been engaging in stealing, using it as a "game." *Id.* at 20-21. Child attributed his behavior to Mother. *Id.* Foster Mother stated, "And everything he's saying he do [sic] he says he gets from his mom." *Id.* at 21.

Lastly, Child is in a pre-adoptive home where he has a positive relationship with his foster parents. Child refers to Foster Parents as "Mom" and "Dad" and Foster Parents are amenable to adoption. N.T., 5/23/16, at 21-22, 30-31. As offered by Marquita Bolden, Child "is extremely bonded with his foster parents. He calls them mom and dad. He introduces himself [with their last name]. He seeks their care. He seems to be feeling quite safe and secure in their home." N.T., 6/23/16, at 43. Further, Daphane Ramos, who witnessed interaction between Foster Parents and Child upon pick-up and drop-off for visitation, acknowledged that Child responds well to Foster Parents and is excited to see them. N.T., 5/23/16, at 43-44. Likewise, Christoria Releford stated, "With [Foster Parents], he do [sic] see them as Mom and Dad. They have a good relationship with him. Because of

the behaviors that they -- that he displays, they're actually very patient parents with him. They really do work with him." *Id.* at 67. As a result, Ms. Releford opined that changing Child's goal to adoption would be in his best interest. *Id.*

Thus, as confirmed by the record, termination of Mother's parental rights serves Child's needs and welfare. Accordingly, based upon our review of the record, we find no abuse of discretion and conclude that the trial court appropriately terminated Mother's parental rights under 23 Pa.C.S. § 2511(a)(2) and (b).

Based on the foregoing analysis of the trial court's termination of Mother's parental rights, we affirm the decree of the trial court.

Decree affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/14/2017